OHIO CIVIL RIGHTS COMMISSION et al., Appellees,

v.

KENT STATE UNIVERSITY, Appellant.

[Cite as *Ohio Civ. Rights Comm. v. Kent State Univ.* (1998), 129 Ohio App.3d 231.]

Court of Appeals of Ohio,
Eleventh District, Portage County.

No. 97–P–0066.

Decided July 27, 1998.

232

*Betty D. Montgomery*, Attorney General, and *Marilyn Tobocman*, Assistant Attorney General, for appellee Ohio Civil Rights Commission.

*Adel M. Novin, pro se.*

*Dennis R. Wilcox* and *Joseph M. Hegedus*, for appellant.

NADER, Judge.

This is an appeal from a judgment of the Portage County Court of Common Pleas affirming a cease-and-desist order of appellee Ohio Civil Rights Commission ("OCRC"), which restrains appellant, Kent State University ("KSU"), from terminating appellee Adel Novin, Ph.D.

Dr. Novin was born in Iran in 1952. He emigrated to the United States in 1974 to pursue a graduate education. In 1991, he became a naturalized American citizen. His family still resides in Iran.

Novin received his Ph.D. in accounting in 1982 from the University of Georgia ("Georgia"). He had obtained a tenure-track teaching position at the University of South Alabama ("South Alabama") in 1979 and continued to teach there while completing his doctoral studies and dissertation at Georgia. In 1983, the year before he was to be considered for tenure at South Alabama, he obtained a tenure-track teaching position at California State University in Fresno ("Fresno"). While teaching at Fresno, Novin spent twenty months in Somalia, Africa,

on a project designed to develop a new accounting system in that country and to teach upcoming accountants the new system.

In 1987, the year before he was to be reviewed for tenure at Fresno, Novin received a nontenure-track position in KSU's College of Business Administration, the Accounting Department, as a visiting professor. The Accounting Department needed a professor to teach, among other courses, accounting information systems at both the undergraduate and graduate levels. It hired Novin, in part, to fill this need.

Novin was not placed on the tenure track when he was appointed in 1987 because he had not shown, in the five years since receiving his doctorate in accounting, any significant progress in research, an area considered rather important for a tenure-track professorship at KSU. Novin explained that after receiving his degree in 1982, he obtained tenure-track teaching positions in two institutions that placed very little emphasis on research and substantial emphasis on teaching and service. He also explained that he was unable to develop any research projects or publication plans during the twenty months he spent in Somalia, Africa. As a result, KSU placed Novin in a nontenure-track position in 1987.

During the 1987–1988 school year, Novin taught accounting information systems, cost accounting, and management accounting. Novin was again placed in a nontenure-track position for the 1988–1989 school year, during which he exclusively taught accounting information systems at both the undergraduate and graduate levels.

In the spring of 1989, Novin applied for a tenure-track position in the Accounting Department and was given the appointment as an assistant professor for the 1989–1990 school year.[1] At that time, the tenure track consisted of a five-year probationary period. After the first year, during which a review would be conducted at the beginning of the spring semester, the candidate was reviewed for reappointment, following the same procedure, in the fall of each year until the tenure decision was made. The decision to grant tenure would be made in the fall of the fifth year. In 1990, the tenure-track probationary period was extended to six years. Professors placed on the tenure track before the change were given the option of choosing either the five- or six-year track. Although Novin was appointed in 1989 as an assistant professor to teach accounting information systems, which he taught almost exclusively over the first year and a half, his appointment to the tenure track was not expressly conditioned upon teaching this course.

---

1. During the 1989–1990 academic year, Novin taught only accounting information systems courses.

In accordance with university policy, Novin was reviewed for reappointment for the 1990–1991 school year in January 1990. In deciding whether to reappoint a faculty member or grant him or her tenure, the three areas considered were research, teaching, and service. Research and teaching were considered to be more significant factors than service in the reappointment and, ultimately, tenure decision. Any information relevant to these three areas was required to be placed by the candidate in the reappointment file; candidates were advised to "put their best foot forward" or "make the best case they could" by providing a complete, favorable reappointment file.

For reappointment, the candidate was required to document continued growth in all three areas, whereas for tenure the candidate was to show that he met the minimum standards, as established by the Accounting Department Handbook, in two areas and excellence in the third.

KSU's standard procedure for reappointment was to first convene a meeting of the tenured members of the department, the Ad Hoc Advisory Committee ("AC"), for a review of the candidate's reappointment file. Each member of the AC would vote for or against reappointment by secret ballot. The department chair did not cast a vote, but was present for the discussion of the candidate. After the AC cast its vote, the department chair would review the committee's recommendation and make his own independent recommendation to the dean of the College of Business Administration, who at all times pertinent to this case was Dr. Charles Upton. Upon receiving the recommendation of the department chair, the dean would convene a meeting of the College Advisory Committee ("CAC"), which consisted of one member of the tenured faculty from each of the five departments in the College of Business Administration. Like the AC, the CAC would review the reappointment file and each member would cast a vote for or against reappointment using the same three criteria used at the department level. The member representing the department to which the candidate in question belonged was not permitted to vote, because he or she had already cast a vote at the department level. The CAC's vote was not by secret ballot. The dean was present for the discussion, but, like the department chair, was not permitted to cast a vote. The dean would then consider the vote of the AC, the recommendation of the department chair, and the vote of the CAC and decide whether to reappoint the candidate for another one-year term. If the candidate was not reappointed, he or she was permitted to appeal the dean's decision to the provost. If no appeal was taken within a prescribed time period or if the provost denied the appeal, the decision of the dean would be final.

In the spring of 1990, Novin's first reappointment process resulted in his

reappointment for the academic year of 1990–1991.[2] The vote of the AC was unanimous in his favor. The department chair, Dr. David Fetyko, sent a letter recommending reappointment to Dean Upton on January 19, 1990. The CAC's vote was also unanimous in Novin's favor, and the dean sent his letter of reappointment to Novin on March 21, 1990.

Novin went through the same process in the fall of 1990. The AC voted unanimously in Novin's favor and Acting Department Chair Richard Brown sent a letter recommending reappointment to Dean Upton on September 28, 1990. However, the CAC voted three-to-one *against* reappointment, because Novin's record in teaching and research over the three years he had been at KSU was less than stellar, in both tenure and nontenure tracks. His reappointment file showed that, in addition to positive feedback from some students, there were many negative student comments regarding Novin's teaching, and his computerized scores on the student evaluations were worse than the department norms.[3] Moreover, Novin was not showing promise in the area of research. He had not published in any noteworthy, ranked journals in his field, and his topic of research, accounting education, was not likely to result in publication in top-tier journals. This was especially troubling to the committee because Novin had received his doctorate eight years before. In essence, a majority of the committee was of the opinion that Novin would be unable to make a case for tenure in his fifth or sixth year, that is, he could not show that he would be excellent in either teaching, research, or service, although possibly adequate in all three.

Dean Upton considered the committee's vote and their concerns, but still recommended reappointment for the upcoming academic year. He was concerned that the university's files contained no warning to Novin that he was deficient in either teaching or research. He also considered the fact that Novin had only been on the tenure track for one academic year. Despite the CAC's vote, Dean Upton sent his letter of reappointment to Novin on November 26, 1990, which detailed the CAC's and his concerns regarding reappointment and tenure in future years. The letter concluded that Novin needed to show "significant improvement" in teaching and research before the next reappointment review. He also met with Novin to discuss the problem areas. In this

---

2. During the 1990–1991 academic year, Novin taught accounting information systems, management accounting, and cost accounting courses.

3. Evidence was presented that Novin repeatedly ranked at or near the bottom in teaching on the Accounting Department's merit review, although he ranked near the top in research. In the merit review process, members of the faculty of each department ranked their peers in the areas of teaching, research, and service to determine each member's share of a monetary award given by the college to the department. This process was separate from the reappointment review.

meeting, Novin apparently agreed to steer his new research to areas other than accounting education, such as international accounting and model building.

The reappointment review of 1991 for the 1992–1993 academic year is the source of the controversy at hand. The AC voted three-to-one for reappointment and the new department chair, Ray Stephens, initially recommended reappointment. The CAC returned a two-to-two vote, which according to university policy, is not a vote for reappointment. Again, the committee was dissatisfied with Dr. Novin's performance in teaching and research; they failed to see any "significant improvement" since the previous year's review, as requested by Dean Upton's 1990 reappointment letter. Moreover, Dr. Novin's statement in favor of his reappointment indicated that he would continue his research in accounting education, against the directions of the dean, but would also begin research in international accounting and model building. It was alleged that during the CAC's meeting, Dean Upton made it clear that he would not reappoint Dr. Novin regardless of the vote. There were also allegations that he badgered the committee members to give him a negative vote.

Dean Upton sent a letter to Novin on November 26, 1991, denying reappointment for the upcoming year. Novin was given a one-year terminal contract for the 1992–1993 academic year.

Novin appealed the dean's decision to the provost, Rudolph Buttlar, on December 16, 1991. In his appeal, Novin detailed his progress in the three areas necessary for reappointment. He also claimed that his experience compared more favorably for reappointment than two other professors appointed to the tenure track in the Accounting Department in 1989, who were reappointed in 1991. After first meeting with Novin, Provost Buttlar contacted Dean Upton and scheduled a meeting to discuss Novin's case for reappointment. Provost Buttlar asked Dean Upton two questions: (1) why terminate now? and (2) how does he compare to other similarly situated professors? Dean Upton, in turn, asked Department Chair Stephens to help him answer these two questions. Stephens did so in a memo dated February 9, 1992, which stated:

· "In response to your request for information in preparation for you[r] meeting with Provost Rudolph Buttlar concerning the appeal of the denial of reappointment of Assistant Professor Adel Novin, the following information is provided.

"My letter recommending reappointment of Assistant Professor Adel Novin was totally based on the recommendation of the Ad Hoc Advisory Committee and the information contained in the reappointment file. This was due to my joining the Department of Accounting in July, 1991, and thus having limited opportunity to interact with Dr. Novin prior to the timing of the reappointment decision.

"Dr. Novin was offered a tenure-track appointment based upon the belief of the faculty that he could fill one of the teaching and research needs of the Department, namely our need for a full-time, tenure-track faculty member who would concentrate in accounting information systems. Dr. Novin has been unable to fulfill this expectation.

"When he was unable to fill this expectation in teaching accounting information systems, he was assigned during the 1990–91 academic year to teaching managerial accounting where he has proven to be barely adequate. Dr. Novin's teaching compares unfavorably with other tenure-track faculty hired around the same time (Drs. Kirch and Zucca), compares unfavorably with other tenure-track faculty who teach managerial accounting (Dr. McMath), and has proven limited in that he can teach acceptably to only one (undergraduate) of the four (undergraduate, MBA, EMBA, doctoral) audiences to whom the Department of Accounting teaches managerial accounting.

"Dr. Novin's inability to teach the required accounting information systems course has forced the Department of Accounting to rely on doctoral students and part-time faculty. Further documentation of his inability would require the Department of Accounting to subject a substantial number of accounting majors to inferior teaching which would prove detrimental to the accounting program for an important course, a course becoming even more important due to the use of computers in accounting.

"Dr. Novin's research is not concerned with either accounting information systems or managerial accounting except for one recent manuscript (the forthcoming article in *Management Accounting*). Both accounting information systems and managerial accounting are areas where research expertise is needed by the Department of Accounting. His current work is focused on accounting education and his current success in this area is due to his nationality (including the recent work accepted for the International Accounting Conference). Publication of such work would be at best in third tier academic journals or second tier professional journals (this includes the forthcoming article in *Management Accounting*).

"Dr. Novin is limited as a researcher due to his research skills. He is a hard worker on his research projects, but shows little promise except as a co-author where others develop the idea and the analysis. This was noted in my letter recommending reappointment and has been further reinforced by my providing feedback as a colleague on his work. The focus of his research outside the teaching areas means that he experiences little interaction between his teaching and research.

"Dr. Novin's service compares unfavorably with his peer group. Dr. Kirch has performed exemplary service focused inside the University through his work with

Beta Alpha Psi and the Accounting Association. Dr. Zucca has performed exemplary service outside the University through her work with the Financial Accounting Standards Board. Both have other service activities. Dr. Novin serves as a member of departmental committees, but his service has simply been that of a member of the committee. In my opinion, he has limits on his ability to perform valuable service inside the University because of his inability to work productively with others in such a capacity. He has shown no ability to work outside the University except in whatever work he does in Iran. In both instances, his service potential is limited for a faculty member at a U.S. university.

"The Ad Hoc Advisory Committee was split on Dr. Novin. One member was quite vocal about his concern for the teaching record. The other members seemed to be willing to go along for another year, acknowledging the limitations in the teaching record. All seemed to acknowledge the low probability of tenure given that Dr. Novin seemed to have a potential for meeting the minimums in teaching, research and service—but just barely in each area. The concern was that Dr. Novin would not achieve a case for promotion (current Department tenure and promotion standards require meeting minimum standards in each of the areas of teaching, research and service, and building a case for tenure and promotion in one or more of these areas).

"My six months of interaction with Dr. Novin reinforce the belief of the 1991 Department of Accounting's Ad Hoc Advisory Committee who evaluated Dr. Novin. It is my belief that he has some probability of having a teaching record meeting the minimum, but only if we continue to assign him to a limited set of courses. The assignment is detrimental to the Department, but assigning him to other courses is also detrimental to the Department since it impacts upon accounting students. It is also my belief that Dr. Novin will have met quantity standards for research publication, but his research quality will be low. Given his publication activity between receiving his doctorate and being employed by Kent State University, his probability of publication after tenure will be low. Dr. Novin has a limited service record. Service requirements are increasing in accounting due to the current direction of the Department and the requirements of the accrediting body. Dr. Novin has limited potential for professional interaction which is required [for] accreditation, especially interaction with U.S. accounting professionals. In addition, Dr. Novin has a low probability of serving on editorial boards or in other capacities with academic organizations. Service standards have been reasonably low in the Department of Accounting. Activity listing, rather than performance has previously been acceptable. Dr. Novin has been careful in this area.

"In summary, my six months of interaction with Dr. Novin leads me to believe that Dr. Novin has no chance of achieving tenure since he has no area in which he can build a case for tenure and promotion. Given that his teaching has become detrimental to the department due to the reasons enumerated above, I would have to recommend that he not be reappointed, even with the same vote in the Ad Hoc Advisory Committee, if the current information had been known at the time of the reappointment recommendation."

This memorandum, since dubbed "the secret memo" or "the secret letter," was given to the provost along with other relevant information contained in Novin's reappointment file. According to another member of the tenured faculty, the existence of this memorandum in Novin's reappointment file, of which Novin was unaware at the time, was a highly irregular departure from university policy. The provost claimed, however, that he did not rely upon the memorandum in making his decision. He ultimately affirmed the dean's decision of nonreappointment. Novin appealed the provost's decision to the President of KSU, Carol Cartwright, who also affirmed the dean's decision.

Novin discovered the existence of the memorandum from Stephens to Dean Upton after the final decision by President Cartwright in 1992. On May 21, 1992, Novin filed a complaint with the OCRC claiming he was discriminated against on the basis of his national origin. The OCRC found probable cause for an investigation and attempted conciliation efforts with KSU, which were unsuccessful. After filing a formal complaint, the OCRC held a hearing on the matter over the course of approximately six weeks in the spring of 1994. The testimony before a hearing examiner for the OCRC took eleven full days. The hearing examiner filed his findings of fact, conclusions of law, and recommendations on April 17, 1995, in which the hearing examiner found merit with Novin's contentions and recommended that the OCRC issue a cease and desist order. On July 20, 1995, the OCRC issued the recommended cease and desist order requiring KSU to reinstate Novin to the tenure track for one year, with back pay, and then to reconsider him for reappointment the following fall, without any discriminatory considerations. Moreover, the order required KSU to report the results of its review of Novin's teaching, research, and service to the OCRC the following fall.

KSU appealed to the Portage County Court of Common Pleas on August 16, 1995, claiming the OCRC erred in finding that it had discriminated against Novin. The transcripts and exhibits[4] entered before the hearing officer were filed with the court and the matter was fully briefed. On June 6, 1997, the trial court

---

4. It appears that several exhibits were not submitted to the trial court, but the failure to formally file these exhibits with the court does not affect the outcome of this appeal.

denied KSU's appeal without a hearing and affirmed the order of the OCRC. KSU appealed to this court, asserting the following as error:

"[1.] The lower court abused its discretion by relying on 'facts' not supported by the record evidence and ignoring other compelling undisputed facts in making its decision.

"[2.] The lower court erred by applying the wrong legal standard under state law and by improperly applying the established Title VII precedent developed in the federal court system.

"[3.] The lower court erred by upholding the improper remedy awarded by the OCRC." [5]

We will begin by addressing that portion of KSU's second assignment of error regarding the appropriate standard of review to be applied by the trial court. We will then address appellant's second assignment of error, that the trial court improperly applied "established Title VII precedent," and the first assignment of error, that the trial court abused its discretion in finding the OCRC's finding of discrimination was supported by reliable, probative, and substantial evidence.

Appellant correctly states that the standard of review to be applied in an appeal of an OCRC order is found in R.C. 4112.06(E)—"reliable, probative and substantial evidence," which has been defined by case law as that level of evidence that would support a finding of discrimination under Title VII of the Civil Rights Act of 1964, Section 2000e *et seq.*, Title 42, U.S.Code. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civ. Rights Comm.* (1981), 66 Ohio St.2d 192, 196, 20 O.O.3d 200, 202–203, 421 N.E.2d 128, 131. According to R.C. 4112.06 and case law interpreting it, a trial court, in reviewing an appeal from an OCRC decision, must affirm the OCRC's finding of discrimination if the finding is supported by reliable, probative, and substantial evidence on the entire record. *Id.* at 200, 20 O.O.3d at 205, 421 N.E.2d at 133; *Ohio Civ. Rights Comm. v. Case W. Res. Univ.* (1996), 76 Ohio St.3d 168, 177, 666 N.E.2d 1376, 1385; *El Grande Steak House v. Ohio Civil Rights Comm.* (1994), 99 Ohio App.3d 557, 562, 651 N.E.2d 440, 443–444.

The Portage County Court of Common Pleas, in affirming the OCRC's order, cited the standard of review in R.C. 119.12, which is to be applied to appeals of decisions of administrative agencies. The Supreme Court of Ohio has held that, for purposes of the standard of review, the OCRC is *not* an agency subject to R.C. 119.12, but is subject to the standard found in R.C. 4112.06. *Plumbers & Steamfitters*, 66 Ohio St.2d at 194, 20 O.O.3d at 201, 421 N.E.2d at 130. However, the court also held that "[t]he evidentiary standard of R.C. 119.12

---

5. Both the OCRC and Novin filed separate briefs.

and 4112.06 is the same: reliable, probative, and substantial evidence. Thus, there is no basis to distinguish R.C. 119.12 and 4112.06 regarding the applicable evidentiary standard, and [case law regarding the scope of review under R.C. 119.12] applies to appeals taken pursuant to R.C. 4112.06." *Id.* at 200, 20 O.O.3d at 205, 421 N.E.2d at 133. Consequently, although the lower court erred in citing R.C. 119.12 for the standard of review for appeals of OCRC decisions, the error was harmless as the standards in R.C. 119.12 and 4112.06 are identical. *Id.*

■ To the extent KSU argues that the trial court failed to conduct a thorough examination of the record, as required by R.C. 4112.06, before reaching its decision to affirm the OCRC's order, we disagree. The judgment entry, although by no means a dissertation on Title VII law as applied to this case, gives sufficient indication that the court reviewed all of the evidence and carefully considered the relevant issues before making its decision and did not merely act as a "rubber stamp" for the OCRC. In fact, the court's judgment entry refers to evidence not discussed in the report of the OCRC hearing examiner. For instance, in its judgment entry, the court referred to the testimony of Dr. Meonske, a member of the AC and the CAC in 1991, wherein he stated that Novin's teaching evaluations were " 'more than acceptable.' " The hearing examiner's report did not contain this reference. Additionally, the judgment entry discussed the procedural irregularities in Novin's 1991 reappointment review, whereas the report of the hearing examiner did not even mention it. These examples, along with the entirety of the court's judgment entry, lead us to conclude that the trial court gave due consideration to the evidence presented and the merits of this case before making its ruling.

■ As an aside, KSU makes a brief argument that the trial court did not engage in an extensive discussion of the shifting burden scheme and KSU's proof of a legitimate nondiscriminatory reason for its decision and, thus, committed error. We cannot conclude that the court erred by failing to recite all portions of the shifting burden scheme and the evidence in support of or in contradiction to each portion in its judgment entry. The judgment entry detailed the court's finding that the prima facie case was established by the requisite standard of proof and the court's finding that there was reliable, probative, and substantial evidence to support the OCRC's finding of discrimination. Because, as will be discussed *infra,* the latter is the ultimate issue in any disparate treatment discrimination case, we conclude that the court did not err in failing to more clearly enunciate its reasoning.

■ Our role, as the reviewing court, in considering the OCRC's order is more limited than that of the trial court. An appellate court is to determine whether the trial court abused its discretion in finding that there was reliable,

probative, and substantial evidence to support the OCRC's finding of discrimination. *Case W. Res. Univ.*, 76 Ohio St.3d at 177, 666 N.E.2d at 1385; *El Grande Steak House*, 99 Ohio App.3d at 562, 651 N.E.2d at 443–444. An abuse of discretion occurs when the court's attitude in making its decision is unreasonable, arbitrary, or capricious, which includes drawing improper, foundationless inferences from the facts presented. *Id.; Republic Steel Corp. v. Hailey* (1986), 30 Ohio App.3d 103, 105–106, 30 OBR 202, 204–206, 506 N.E.2d 1215, 1218–1220.[6]

Regarding the substance of this appeal, R.C. 4112.02(A)[7] provides:

"It shall be an unlawful discriminatory practice: (A) For any employer, because of the * * * national origin * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."[8]

■ The Supreme Court of Ohio has held that federal case law interpreting Title VII of the Civil Rights Act of 1964 is applicable to cases involving an alleged violation of R.C. Chapter 4112. *Plumbers & Steamfitters*, 66 Ohio St.2d at 196, 20 O.O.3d at 202–203, 421 N.E.2d at 131, citing *State ex rel. Republic Steel Corp. v. Ohio Civ. Rights Comm.* (1975), 44 Ohio St.2d 178, 73 O.O.2d 478, 339 N.E.2d 658, and *Weiner v. Cuyahoga Community College Dist.* (1969), 19 Ohio St.2d 35, 48 O.O.2d 48, 249 N.E.2d 907. Under Title VII law, an employee[9] may prove intentional discrimination in a disparate treatment case[10] such as the one *sub*

---

6. In the federal system, the standard of review is "clearly erroneous" because the finding of discrimination is a factual finding of the district court, which is entitled to deference under Fed.R.Civ.P. 52(a). *Pullman–Standard v. Swint* (1982), 456 U.S. 273, 290, 102 S.Ct. 1781, 1791, 72 L.Ed.2d 66, 80–81.

7. Although R.C. 4112.02 has been amended several times since that version in effect at the time of the alleged discriminatory conduct in this case, Subsection (A) has remained untouched by those amendments.

8. Every employment decision necessarily involves *some* type of "discrimination" in the word's ordinary sense: "The ability or power to discern." Webster's II New Riverside University Dictionary (1988) 385. There will always be a differentiating factor that permits an employer to choose between applicants, whether it be where a particular applicant went to school, whom the applicant knows, or what the applicant is wearing. It is only discrimination on certain invidious grounds such as race, religion, national origin, etc. that violates R.C. 4112.02(A) and Title VII.

9. Throughout this opinion the term "employee" also refers to the OCRC as a representative of an employee.

10. There are different types of discrimination in employment settings: disparate treatment (intentional discriminatory treatment of an employee) and disparate impact (where a facially neutral employment policy is applied in a discriminatory fashion, without regard to the

*judice* either directly or indirectly. *Lynch v. Freeman* (C.A.6, 1987), 817 F.2d 380, 382.

If an employee establishes intentional discrimination by a preponderance of *direct* evidence, the burden of proof by a preponderance shifts to the employer to show that it would have made the same employment decision even without the discriminatory animus. *Price Waterhouse v. Hopkins* (1989), 490 U.S. 228, 244–245, 253, 109 S.Ct. 1775, 1787–1788, 1792, 104 L.Ed.2d 268, 284–285, 289–290. This is often called a "mixed motives" case. In Ohio, it is unclear when this *Price Waterhouse* analysis comes into play. See *Mauzy v. Kelly Serv., Inc.* (1996), 75 Ohio St.3d 578, 586, 664 N.E.2d 1272, 1279 ("[T]he term 'direct evidence,' *whatever it means* [emphasis added] and to the extent it is even required, is used to distinguish a * * * *Price Waterhouse* case from a *McDonnell Douglas* case [*McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668]. * * * The issue of what is required [to trigger *Price Waterhouse*] is an issue separate and apart from the issue of what is required to raise an inference of discrimination [under *McDonnell Douglas*]."). Because the parties failed to argue *Price Waterhouse* before the OCRC and the lower court, and because the finding of discrimination was made using the *McDonnell Douglas* scheme, see *infra*, we will confine our analysis to the latter and will refrain from delving into the definition of "direct evidence" required to trigger a *Price Waterhouse* analysis.

The Supreme Court of Ohio stated in *Mauzy* that an employee may establish a case of intentional discrimination in one of two ways. First, the employee may establish a case of discrimination using the now familiar shifting burden scheme established in *McDonnell Douglas*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, and revisited in *Texas Dept. of Community Affairs v. Burdine* (1981), 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (the "*McDonnell Douglas–Burdine* shifting burden scheme"). Under this scheme, the employee bears the initial burden to prove a prima facie case of discrimination, which requires proof of the following elements, under the facts of this case[11]: (1) that the employee was a member of a protected class of persons, (2) that he was qualified for the position, and (3) that he was treated differently from "similarly situated" employees that were not members of that class. *Mitchell v. Toledo Hosp.* (C.A.6, 1992), 964 F.2d 577, 582–583. See, also, *Burdine*, 450 U.S. at 258, 101 S.Ct. at 1096, 67 L.Ed.2d at 218. Demonstration of the prima facie case is generally an easy burden for the

employer's intention). See *Hazen Paper Co. v. Biggins* (1993), 507 U.S. 604, 609, 113 S.Ct. 1701, 1705–1706, 123 L.Ed.2d 338, 346.

**11.** The elements of a prima facie case of intentional discrimination under the shifting burden scheme vary with the facts of each case. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677–678, fn. 13.

employee to carry. *Id.*, 450 U.S. at 253, 101 S.Ct. at 1093–1094, 67 L.Ed.2d at 215.

A second method of establishing a prima facie, inferential case of discrimination is "by presenting evidence, of any nature, to show that the employer more likely than not was motivated by discriminatory animus." *Mauzy*, 75 Ohio St.3d at 586–587, 664 N.E.2d at 1279.

If the employee establishes the prima facie case, a presumption of intentional discrimination is raised. *Id.* at 584, 664 N.E.2d at 1277–1278. This causes the burden *of production* to shift to the employer to articulate and present evidence which, if believed, would present a legitimate, nondiscriminatory reason for the employment decision. *Id.* at 585, 664 N.E.2d at 1278; *St. Mary's Honor Ctr. v. Hicks* (1993), 509 U.S. 502, 509–511, 113 S.Ct. 2742, 2748–2749, 125 L.Ed.2d 407, 417–419. Like the prima facie case, the employer's burden of production is relatively light. *Equal Emp. Opportunity Comm. v. Flasher Co., Inc.* (C.A.10, 1992), 986 F.2d 1312, 1318.

If the employer satisfies its burden, the presumption of discrimination drops from the case. *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094–1095, 67 L.Ed.2d at 216–217; *Hicks*, 509 U.S. at 509–511, 113 S.Ct. at 2748–2749, 125 L.Ed.2d at 417–419. The employee then reassumes the burden of persuasion to show that the reasons proffered by the employer are merely pretext for intentional discrimination. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095, 67 L.Ed.2d at 217. The employee may not satisfy his burden in this final stage by merely showing the employer's reasons are unworthy of credence. *Hicks*, 509 U.S. at 520, 113 S.Ct. at 2754, 125 L.Ed.2d at 424–425. Nor is the fact that the court may disagree with the employer's judgment of the employee determinative. *Burdine*, 450 U.S. at 259, 101 S.Ct. at 1096–1097, 67 L.Ed.2d at 218–219; *Pollard v. Rea Magnet Wire Co., Inc.* (C.A.7, 1987), 824 F.2d 557, 559 (stating, "A reason honestly described but poorly founded is not a pretext"). He must also show that the employer's real reason for the employment decision was unlawful discrimination (*i.e.*, discrimination on the basis of national origin, gender, race, etc.). *Hicks*, 509 U.S. at 520, 113 S.Ct. at 2754, 125 L.Ed.2d at 424–425.

■ The shifting burden scheme enunciated above is merely a method of ordering the proof and narrowing the issues at trial. *Id.* at 521, 113 S.Ct. at 2754–2755, 125 L.Ed.2d at 425–426; *Mercy Hosp. Assn. v. Ohio Civ. Rights Comm.* (1989), 65 Ohio App.3d 613, 616, 584 N.E.2d 1287, 1289–1290. It must be remembered that, *throughout the presentation of the evidence, the employee always retains the burden to persuade the factfinder on the ultimate issue:* whether the employment decision was a result of intentional unlawful discrimination. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–1094, 67 L.Ed.2d at 215.

■ Regarding the prima facie case discussed *supra*, no one disputes that Novin is Iranian or that he was not reappointed in 1991 for the 1992–1993 academic year. Although KSU does not specifically challenge this aspect of the case, Novin's qualifications for reappointment were disputed below (generally in the context of whether KSU had a valid, nondiscriminatory reason for not reappointing him). It has been held that in considering whether an employee has established a prima facie case of discrimination, where there is a genuine dispute over an individual's qualifications, this element is satisfied. See *Bennun v. Rutgers Univ.* (D.N.J.1990), 737 F.Supp. 1393. The heart of the debate regarding the establishment of the prima facie case is whether Novin was treated differently from "similarly situated" employees at KSU. The hearing officer, the OCRC, and the Portage County Court of Common Pleas concluded that he was. We agree.

■ A similarly situated employee is one with whom the employee wishes to compare his treatment who is subject to the same superiors and the same standards and is sufficiently similar in conduct to make a comparison for purposes of determining the existence of discrimination meaningful. *Mitchell,* 964 F.2d at 583. The candidates need not be identical in all respects before a finding of similar situation can be made. *Bennun, supra.*

Novin and KSU have compared his credentials with those of Drs. Linda Zucca and David Kirch, who were also appointed to tenure-track assistant professorships in August 1989. At the time of the 1991 reappointment review, all three were second-year, tenure-track assistant professors in the Accounting Department, and all three were subject to the same supervisor, the chair of the Accounting Department, the same review and reappointment procedures (consideration by the AC and the CAC), and the same standards or requirements.

Appellant attempts to argue that Novin was not situated similarly to Drs. Kirch and Zucca because the former's reappointment file was not nearly as impressive as the latters', making them sufficiently different to justify seemingly different treatment. Although it may (or may not) be true, this argument is more appropriately made when discussing whether KSU had a legitimate reason for its employment decisions or whether KSU's reasons were pretext for invidious discrimination. At this point in the analysis of the prima facie case, we are concerned with two inquiries: (1) whether Novin was "similarly situated" to Kirch and Zucca (*i.e.,* whether their positions and qualifications were similar enough to make a comparison of their treatment meaningful) and (2) whether, if similar, Novin was treated differently. *Mitchell,* 964 F.2d at 582. We are to refrain from comparing the substance of each candidate's evaluations (whether one candidate was more qualified than the others) because that is best left in the hands of the faculty and administration at KSU. *Kunda v. Muhlenberg College* (C.A.3, 1980),

621 F.2d 532, 547. The critical inquiry is how the generally applicable standards were applied to each candidate.

We conclude that, for purposes of R.C. 4112.02(A), the trial court did not abuse its discretion in finding that Novin was similarly situated to Kirch and Zucca because they were all employed in the same department at the same level and were subject to the same superiors and the same review standards.[12] We also conclude that Novin was treated differently from Kirch and Zucca. As appellees allege, Novin was subjected to vastly different implementation of the general standards throughout the entire reappointment process than were Kirch and Zucca. The reappointment standards were applied very strictly to him and were applied with flexibility and leniency to Kirch and Zucca. For instance, it was undisputed that Kirch and Zucca demonstrated substandard performance in the area of research during each review, but were granted reappointment. They were not asked to change their research focus to a more suitable topic. In fact, they were provided research support during the summer sessions and were given sufficient time to show progress toward publication. Timetables for publication were established but were not enforced, and any deficiency in their reappointment records was overlooked. Novin, on the other hand, was given no research support and was given, albeit at his request, a full teaching load each summer. He was also told in his reappointment review of 1990 that he must change his topic of research, although his was one listed in the department handbook. He was given one year to show "significant progress" in his new area(s) of research, even though several witnesses testified that from the inception of the research idea to publication could take from two to three years or more. In the area of teaching, Dr. Novin demonstrated what was characterized as substandard performance and was not granted reappointment predominantly on this basis. No flexibility was shown him when his performance in one area was "substandard," whereas, as stated previously, Kirch and Zucca were shown leniency when each had an area of substandard performance. Thus, we conclude the trial court did not abuse its discretion in finding that Novin, a similarly situated employee, was treated differently from Kirch and Zucca.[13]

---

**12.** At oral argument, KSU attempted to claim that another professor, Dr. Frank Winfrey, was *more* similarly situated to Novin for comparison purposes. Winfrey was hired to the tenure-track after Novin and was a member of another department, the Department of Administrative Sciences. Thus, we conclude that Winfrey was not similarly situated for R.C. 4112.02(A) purposes.

**13.** We would like to point out that this case would also fit into the "classic" *McDonnell Douglas–Burdine* prima facie case, although the OCRC and the trial court appeared to overlook it. In this "classic" case the employee's prima facie case would be made by showing (1) that the employee was a member of a protected class, (2) that the employee was qualified for the position in question, (3) that the employee was adversely affected by an employment

Because the OCRC presented sufficient evidence to establish a prima facie case, an inference of discrimination was raised which, in order to prevail, KSU was required to rebut by presenting evidence that, if believed, would provide a legitimate, nondiscriminatory reason for the employment decision. *Burdine.* KSU presented evidence of the following reasons for its decision: (1) Novin's teaching record, in the form of student evaluations, showed that he was barely adequate; (2) Novin was not doing research in the area for which he was hired, accounting information systems; (3) Novin was doing research in an area that would not be published in a top-tier journal because it was not "discovery" research[14]; (4) Novin's research was not of the caliber required by the university; and (5) Novin would not be able to make a case for tenure in his fifth or sixth year at KSU, that is, he would not be able to show that he was exceptional in one or more of the three areas of consideration.

KSU also attempted to show that the differences in the treatment afforded to Novin as compared to Kirch and Zucca were justified by their superior qualifications. According to KSU, Novin's teaching record was less than outstanding during the relevant periods, although it did meet the minimum standards of the Accounting Department, that is, his scores were at or around the department norm, and he received both positive and negative student comments. Kirch and Zucca, on the other hand, consistently received better scores than both Novin and the department norm. In fact, Kirch and Zucca were repeatedly rated by their peers as the top two professors in the department and often received students' comments such as "This is the best professor I have ever had."

In the area of research, at the time the reappointment decision was made, Novin had coauthored several articles in *unranked* academic and professional journals in accounting education and had presented some papers at accounting conferences. He had also submitted one sole-authored and one coauthored article for publication consideration in the fall of 1991, which had not been

---

decision, and (4) that the employee was replaced by a nonmember of the class. *Mitchell,* 964 F.2d at 582. The class in this case consists of those of Iranian descent. It is uncontroverted that Novin belongs to this class. As discussed previously, Novin was qualified for his reappointment and was adversely affected by the decision not to reappoint him in 1991 for the 1992–1993 academic year (he was instead given a terminal contract for that year). The evidence showed that two non-Iranian professors were hired for the 1993–1994 school year who taught the classes Novin taught. KSU claimed these professors were not hired to "replace" Novin, but were hired to teach certain courses that Novin happened to teach before his termination. Regardless of how KSU characterizes the hiring of these two professors, it is clear they were replacements for Novin; they filled the void left by his absence. Therefore, the final element of the classic prima facie case was established, although none of the decision-makers below addressed this method.

14. Discovery research is that which is novel and adds something previously not known in the profession.

accepted at that time. Even considering this quantity of research and publication, Novin's record was not noteworthy under university standards, especially given the fact that he had obtained his doctorate seven years before Kirch and Zucca.[15] In contrast, Kirch and Zucca had developed research plans and were in the process of gathering information and compiling statistics to support a publication. Also, Kirch had published several articles in professional journals, but Zucca had published none.[16]

According to KSU, Kirch and Zucca excelled in their service to the university and their profession, whereas Novin did not necessarily excel, but did contribute.

KSU alleged another dissimilarity: in the reappointment reviews in 1990 (for the 1991–1992 academic year) and 1991 (for the 1992–1993 academic year), Kirch and Zucca received positive reappointment votes from the CAC (four-to-zero in 1990 and three-to-one in 1991), whereas Novin did not (three-to-one against in 1990 and two-to-two in 1991).

The foregoing was sufficient to enable KSU to meet its burden under the shifting burden scheme. See *Lynn v. Regents of the Univ. of California* (C.A.9, 1981), 656 F.2d 1337, 1344. Thus, the presumption of intentional discrimination was successfully rebutted, and the only issue, the "ultimate issue," was whether KSU's decision not to reappoint Novin was unlawfully motivated by consideration of his national origin. Novin and the OCRC could meet this ultimate burden by showing that the reasons given were not the actual reasons why he was not reappointed, but that KSU was motivated by discrimination based on Novin's national origin. *Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407

Novin primarily attempted to meet his burden by refuting the comparisons KSU made between him and Kirch and Zucca, claiming that he possessed equal, if not superior, qualifications. He also claimed that, regardless of their qualifications, he was not given the same opportunities to perform as Kirch and Zucca, that his teaching was acceptable at the department norms,[17] that the Accounting

---

15. Although the university policy manual did not expressly mention the length of time since the candidate received his doctorate as a consideration, it is clear that some of the individuals involved in the reappointment process considered it in making reappointment decisions.

16. Publications in professional journals are not considered as highly as those in academic journals.

17. Novin attempted to compare his teaching to that of Dr. Ran Barniv, who was appointed to a tenure-track position in 1990 as an associate professor, one step above the level of assistant professor. Barniv was recruited to KSU because of his extensive research record to serve as a "research catalyst" in the Accounting Department. His teaching evaluations were at or around the department norm, with mixed student comments. In reappointing and subsequently granting Barniv tenure, the department chair and dean stated that his "average" teaching evaluations were sufficient.

Department Handbook does not require a professor to perform research in the areas in which he teaches, and that he was not hired to teach accounting information systems exclusively. The most damaging aspect of Novin's case against KSU is the memorandum, quoted *supra,* from Department Chair Stephens to Dean Upton, which contains arguable inaccuracies and several gratuitous references to Novin's national origin: (1) Novin's success was not based upon his merit, but was based upon the fact that he is Iranian; (2) Novin "has no ability to work outside the University except in whatever work he does in Iran"; and (3) Novin was unable to fit in, so to speak, in American universities and with American professionals. Basically, the tenor of this memorandum, in conjunction with the stated reasons for not reappointing him, is that Novin has no potential for excellence in any regard in America because he is Iranian, and any excellence he may show is due to his Iranian heritage. In other words, Novin is in a lose-lose situation because of his national origin. Although, as appellees conceded in oral argument, the memorandum is not *per se* discrimination (*i.e.,* direct evidence of discrimination), it is circumstantial evidence of it.

Moreover, the presence of this memorandum in Novin's reappointment file was a departure from University policy. "Departures from procedural regularity * * * can raise a question as to the good faith of the [reappointment decision] process." *Zahorik v. Cornell Univ.* (C.A.2, 1984), 729 F.2d 85, 93.

KSU argues that the memorandum is not proper evidence of discrimination because it was written by an individual who was not responsible for the decision not to reappoint and because it was written after the decision was made by the Dean.[18] This argument is flawed in one important respect. This memorandum, although written by Stephens, was written *at the request of Dean Upton.* After Dean Upton received the memorandum, he forwarded it to the provost along with the other materials in the reappointment file. This act can lead to a permissible inference that Dean Upton agreed with the contents of the memorandum or, at a minimum, did not oppose them. Moreover, for the same reason, the fact that the memorandum was written after the dean had made his decision does not render improper its use as *evidence* of discrimination. Dean Upton's implicit adoption of the memorandum can serve as evidence of his discriminatory intent, at the time of the decision not to reappoint Novin, even though the memorandum was not actually written until later. Of course, the memorandum is not conclusive evidence, but it is competent to support the inference of intentional discrimination, and the trial court was within its discretion to use it as such. Contrary to KSU's position, the comments in the memorandum do not constitute "stray

---

18. All parties agree that Dean Upton was the decision-maker, even though the candidate is given the right to appeal the dean's decision to the provost. For a similar hierarchy, see *Lever v. Northwestern Univ.* (C.A.7, 1992), 979 F.2d 552.

remarks in the workplace" that normally do not justify a finding of discrimination. They constitute evidence tending to prove that KSU, through its agents, engaged in unlawful discrimination.

In light of our deferential standard of review, we conclude that the trial court did not abuse its discretion in concluding that there was reliable, probative, and substantial evidence to support the OCRC's finding of discrimination. We recognize that there exists contrary evidence in the record. We do not, however, believe that the court erred. in disregarding it as unworthy of credence. Nor have we found after careful review of the evidence, as KSU urges, that the report of the hearing officer, the order of the OCRC, or the judgment of the trial court are "replete with inaccuracies."

We are also aware that courts are to tread lightly when reviewing faculty employment decisions, especially in the area of academia. See, *e.g., Kunda,* 621 F.2d 532. At the same time, we are bound to uphold the laws of this state, which prohibit discrimination in employment decisions, in any context, on the basis of, *inter alia,* national origin. "Academic freedom does not embrace the freedom to discriminate." *Villanueva v. Wellesley College* (C.A.1, 1991), 930 F.2d 124, 129.

The first and second assignments of error are without merit.

For its final assignment of error, KSU challenges the remedies granted to Novin by the OCRC and the court. Specifically, KSU takes issue with (1) the award of back pay for a full summer session, (2) the award of an additional terminal year contract if KSU decides not to reappoint Novin after reinstatement, and (3) the order that KSU report the results of its next reappointment decision regarding Novin, with supporting documents.

R.C. 4112.05(G)[19] supplies the OCRC with authority to remedy proven discrimination in employment situations and provides:

"If * * * the commission determines that the [employer] has engaged in, or is engaging in, any unlawful discriminatory practice, * * * the commission * * * shall issue * * * and * * * cause to be served on such [employer] an order requiring such [employer] to cease and desist from such unlawful discriminatory practice and to take such further affirmative or other action as will effectuate the purposes of sections 4112.01 to 4112.08 of the Revised Code, including, but not limited to, hiring, reinstatement, or upgrading of employees with, or without, back pay, * * * including a requirement for reports of the manner of compliance. If the commission directs payment of back pay, it shall make allowance for

---

19. Although R.C. 4112.05 has been amended several times since that version in effect at the time of the alleged discriminatory conduct in this case, Subsection (G) has remained untouched by those amendments.

interim earnings. * * * Upon the submission of such reports of compliance the commission may issue a declaratory order stating that the [employer] has ceased to engage in unlawful discriminatory practices."

First, the trial court, in affirming the cease-and-desist order, awarded Novin back pay for an entire year, including compensation for a full teaching load during the summer; the order does not specify for which specific year, if any, the back pay award is intended to compensate Novin. KSU claims that because tenure-track professors are not entitled to teach summer classes, which are compensated separately from their "regular" appointments, and because Novin was offered a teaching position for the summer of 1993 but turned it down, he should not be awarded back pay for a summer session. The record shows that Novin taught a full load each summer session he was employed at KSU and that he initially turned down the summer 1993 offer because the compensation he would have received was inferior to that which he had received in the past. Novin later reconsidered his rejection of the offer and requested to teach that summer, but Stephens stated that all of the summer classes were already assigned.

The remedies in R.C. 4112.05(G) from which the OCRC may choose in a discrimination case are broad, as evidenced by the language found therein that the OCRC may "take such further affirmative or other action as will effectuate the purposes of" R.C. Chapter 4112. The goal of R.C. Chapter 4112 is to make persons who have been subjected to discrimination whole for the injuries they suffered because of the unlawful discrimination—to restore them to the position they enjoyed before they were subjected to discriminatory practices, without seeking to punish the employer. *Ohio Civ. Rights Comm. v. Lucas Cty. Welfare Dept.* (1982), 6 Ohio App.3d 14, 6 OBR 38, 451 N.E.2d 1246. To further this purpose, R.C. 4112.05(G) permits the OCRC, in its discretion, to award back pay, with a setoff for interim earnings. The award of back pay for Novin could reasonably be interpreted to compensate him for the 1993–1994 academic school year, the first academic year after his terminal contract expired, including the following summer session (1994), without regard to, and without compensation for, the summer 1993 session. We find no legal error or abuse of discretion in this award, and the fact that Dr. Novin rejected the offer for the summer of 1993 does not militate against this finding.

Next, KSU challenges the award of an additional one-year terminal contract if KSU lawfully (*i.e.*, without discrimination) decides not to reappoint Novin after his reinstatement. KSU claims that this violates the collective bargaining agreement entered into between KSU and its employees pursuant to R.C. Chapter 4117 and, thus, violates that chapter. According to KSU, the collective bargaining agreement requires KSU to give twelve months' notice (a

one-year terminal contract) to tenure-track professors who have successfully been through at least two reappointment processes. Although the assistant dean of the College of Business Administration, James Louis, testified that University policy was to give this twelve months' notice, we have examined the collective bargaining agreement in effect in 1991 and find no such provision applicable to tenure-track professors such as Novin, although there are two provisions regarding terminal year contracts. The first provision in the collective bargaining agreement relating to notice of termination is in relation to termination caused by a reduction in the number of professors in the university as a result of financial considerations. This provision clearly does not apply in this case. The second is that applying to those professors being considered for tenure. Novin was not being considered for tenure in 1991, so this provision does not apply. Thus, R.C. Chapter 4117 is not even implicated in this award.

Moreover, we can find no other reason to reverse the award. Again, the goal of R.C. Chapter 4112 is to place the employee in the place he would have occupied had the discrimination not occurred. If we place Novin in the position he occupied before the decision not to reappoint him, he would have received a one-year reappointment contract for the 1992–1993 academic year, instead of a one-year terminal contract. The award of a one-year terminal contract should KSU decide not to reappoint Novin after reinstatement is not an "additional" terminal contract because he never lawfully received the first one.

 Finally, KSU claims that by requiring it to report to the OCRC after Novin's next reappointment review, the OCRC is attempting to extend its jurisdiction and usurp the jurisdiction of the trial court, in violation of R.C. 4112.06 and Ohio Adm.Code 4112–3–11, which limit the OCRC's jurisdiction to the time period before its decision is appealed to the trial court. We disagree.

R.C. 4112.05(G) provides that the OCRC may require an employer found to have engaged in unlawful discriminatory practices to report its compliance. The statute does not provide a limitation on the time period during which the employer and the OCRC may accomplish this, but we will presume it implies a reasonable period of time. *State v. Gaul* (1997), 117 Ohio App.3d 839, 850, 691 N.E.2d 760, 767; *Luke v. Luke* (Feb. 20, 1998), Lake App. No. 97–L–044, unreported, 1998 WL 172813, fn. 6. Requiring a report of compliance is not a matter of usurping the trial court's jurisdiction. It is more akin to *enforcement* powers and can be analogized to the jurisdiction of a trial court after an appeal has been taken to the appellate court. When an appeal is taken, the trial court no longer has the power to revisit an issue already decided, but does have the power to enforce its order(s). The same can be said of the OCRC; it may not revisit its decision regarding discrimination, but it may monitor compliance with its cease-and-desist order(s). This is what the OCRC's order accomplished in

this case—monitoring whether KSU complies with the cease-and-desist order, which was affirmed by the trial court. R.C. 4112.05(G) specifically authorizes this. *Miller Properties v. Ohio Civ. Rights Comm.* (1972), 34 Ohio App.2d 113, 119, 63 O.O.2d 169, 172, 296 N.E.2d 300, 304.

The third assignment of error is meritless.

In accordance with the foregoing, the judgment of the Portage County Court of Common Pleas is affirmed.

*Judgment affirmed.*

FORD, P.J., concurs.

MAHONEY, J., dissents.

EDWARD J. MAHONEY, J., retired, of the Ninth Appellate District, sitting by assignment.