BRANDENBURGER, APPELLANT, *v.* HILTI, INC., APPELLEE.

(No. 54852—Decided March 27, 1989.)

*Sinagra & Chinnock Co., L.P.A., William F. Chinnock, Anthony C. Sinagra* and *Ronald L. McLaughlin,* for appellant.

*Mansour, Gavin, Gerlack & Manos Co., L.P.A., Jeffrey M. Embleton* and *Eli Manos,* for appellee.

KRUPANSKY, P.J. Plaintiff Richard Brandenburger filed a complaint in Cuyahoga County Common Pleas

Court, case number 81269, against defendant Hilti, Inc. Plaintiff's second amended complaint alleged: (1) breach of an implied employment contract; (2) reckless infliction of severe emotional distress; (3) breach of the covenant of good faith; and (4) wrongful discharge in violation of public policy.

At trial defendant Hilti moved for a directed verdict at the close of plaintiff's case-in-chief. On November 9, 1987 the trial court granted Hilti a directed verdict on all plaintiff's claims. Plaintiff filed a timely notice of appeal assigning four errors.

The relevant facts follow:

Plaintiff began drinking and using heroin when he was sixteen and dropped out of high school in the tenth grade. Plaintiff continued to use drugs for the next three years. In 1979 plaintiff was hired by Hilti's steel division in Kansas City, Missouri, to work for Sisco, Incorporated, a unionized subsidiary of Hilti. Defendant Hilti, a European-based company with divisions throughout the world, provides contract labor for several industries. In December 1982 Sisco became a division of Hilti.

In 1981 plaintiff received a promotion to a supervisory position and was sent to Sharon Steel in Sharon, Pennsylvania. Plaintiff was promoted from a laborer's position to a foreman who supervised between ten to twenty men. Plaintiff was concerned about his job security when he left the union for a salaried position and expressed this concern to Hilti management. Plaintiff was told: "I should not fear because as long as I did a good job I would have a job."

In 1982 plaintiff and his wife were divorced. Prior to the divorce plaintiff attempted suicide and was hospitalized two months for depression at the Trumbull County Mental Health Center. While at the mental health center plaintiff was visited by Jean Gilman, Hilti's national operations officer. It was at this point plaintiff admitted to Gilman that plaintiff's alcohol use was part of his problem. Plaintiff's medical insurance through Hilti covered his two-month in-patient treatment at the mental health center.

In June 1983 plaintiff was arrested in Youngstown, Ohio, and charged with driving under the influence of alcohol. At the urging of the Youngstown municipal judge who sentenced him, plaintiff entered the Alcoholic Clinic of Youngstown where he remained as a patient for sixteen days. Although the program at the clinic was scheduled for twenty-eight days, plaintiff walked out after sixteen days with a diagnosis of chronic alcoholism. Plaintiff's medical insurance through Hilti paid for plaintiff's visit to the clinic.

Due to plaintiff's alcoholism, Hilti transferred plaintiff from Sharon Steel to J & L Steel in Cleveland. Plaintiff received the same salary and position at J & L Steel as he did at Sharon Steel. When plaintiff arrived at J & L Steel he met with his supervisor, William Vannucci. Vannucci and plaintiff agreed plaintiff would be evaluated only on his job performance and attendance. Vannucci also told the plaintiff daily, "if you mess up, you're out the door."

At trial plaintiff testified J & L Steel was a dangerous place to work, it was a place where one needed to "keep his wits about him" and have safety always as a concern. One of plaintiff's daily duties was to drive a full-sized locomotive. Plaintiff was responsible for moving a twenty-six-ton ingot mold to the mold repair yard after a crane would place it on the train. Plaintiff also worked with grinders which weighed over two tons.

In March 1984, in spite of being threatened by Vannucci almost daily with "take one more drink and you're

out the door," plaintiff began drinking and "using." "Using," plaintiff explained, meant injecting heroin into his veins.

On July 10 and 11, 1984 plaintiff "really tied one on and just went out and started to drink and couldn't stop." Plaintiff failed to attend work these two days. Plaintiff then called Jean Gilman, Hilti's national operations officer, and requested help. Gilman took plaintiff to Serenity Hall at St. John Hospital since plaintiff was intoxicated at the time. During the admittance process at St. John, plaintiff was asked, with Jean Gilman in attendance, "what is your drug of choice?" Plaintiff replied "heroin." This was the first time Hilti became aware plaintiff was a heroin user. Plaintiff was admitted to St. John Hospital and received an indefinite medical leave from his employment at Hilti. Plaintiff's medical insurance through Hilti covered plaintiff's treatment at St. John.

When he left St. John after a stay of seven days, plaintiff went to the home of his Alcoholics Anonymous sponsor and discussed his alternatives. Plaintiff was granted permission by Hilti's personnel manager to enter Gateway Rehabilitation Center, a top-rated alcoholism treatment facility. Plaintiff's medical insurance through Hilti covered plaintiff's treatment at Gateway.

On August 22, 1984 plaintiff was released from Gateway, having completed the twenty-eight-day program. When plaintiff returned to Cleveland he called Hilti to request his work schedule. Plaintiff was told "take a week off to adjust" and then come in for a meeting. On August 29, 1984 plaintiff attended a meeting with Jean Gilman at which time Gilman told plaintiff he was terminated. Plaintiff testified he was in shock since he did not expect to be discharged from Hilti. Plaintiff also claims to have suffered a loss of dignity as a result of his termination.

Plaintiff's assignments of error follow:

"I. The trial court erred in refusing to allow the jury to render its decision on plaintiff's claim for breach of implied agreement because (A) the law of Ohio recognizes claims for breach of implied agreement, and (B) based upon the evidence presented to the jury, reasonable minds could reach different conclusions upon material questions of fact, precluding directed verdict for defendant.

"II. The trial court erred in refusing to allow the jury to render its decision on plaintiff's claim for reckless infliction of severe emotional distress because (A) the law of Ohio recognizes claims for reckless infliction of severe emotional distress, and (B) based upon the evidence presented to the jury, reasonable minds could reach different conclusions upon material questions of fact, precluding directed verdict for defendant.

"III. The trial court erred in refusing to allow the jury to render its decision on plaintiff's claim for breach of the covenant of good faith because (A) the law of Ohio recognizes claims for breach of the covenant of good faith, and (B) based upon the evidence presented to the jury, reasonable minds could reach different conclusions upon material questions of fact precluding directed verdict for defendant.

"IV. The trial court erred in refusing to allow the jury to render its decision on plaintiff's claim for violation of public policy because (A) the law of Ohio recognizes claims for violation of public policy, and (B) based upon the evidence presented to the jury, reasonable minds could reach different conclusions upon material questions of fact, precluding directed verdict for defendant."

Plaintiff's assignments of error lack merit.

Defendant contends plaintiff was employed on an at-will basis. Plaintiff argues the trial court erred when it directed a verdict for defendant Hilti at the close of plaintiff's case-in-chief since reasonable minds could differ on whether plaintiff had an implied employment agreement with Hilti and whether plaintiff was discharged for just cause. Plaintiff's argument is unpersuasive.

Civ. R. 50(A)(4) provides as follows:

"When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

In *Ruta* v. *Breckenridge-Remy Co.* (1982), 69 Ohio St. 2d 66, 68, 23 O.O. 3d 115, 116, 430 N.E. 2d 935, 938, the court stated:

"When a motion for a directed verdict is entered, what is being tested is a question of law; that is, the legal sufficiency of the evidence to take the case to the jury. This * * * assumes the truth of the evidence supporting the facts essential to the claim of the party against whom the motion is directed, and gives to that party the benefit of all reasonable inferences from that evidence."

An oral employment agreement of indefinite duration is presumed to be terminable at will for any reason not contrary to law. *Mers* v. *Dispatch Printing Co.* (1985), 19 Ohio St. 3d 100, 103, 19 OBR 261, 263, 483 N.E. 2d 150, 153. Furthermore, at-will employment contracts may be terminated for any cause, at any time whatsoever, even if done in gross or reckless disregard for an employee's rights. *Phung* v. *Waste Management, Inc.* (1986), 23 Ohio St. 3d 100, 102, 23 OBR 260, 261, 491 N.E. 2d 1114, 1116.

In *Mers, supra,* the court recognized two narrow exceptions to the employment-at-will doctrine which alter the terms for discharge and limit the at-will employment agreement. The only exception relevant to the case *sub judice* follows:

"The facts and circumstances surrounding an oral employment-at-will agreement, including the character of the employment, custom, the course of dealing between the parties, company policy, or any other fact which may illuminate the question, can be considered by the trier of fact in order to determine the agreement's explicit and implicit terms concerning discharge." *Mers, supra,* at paragraph two of the syllabus.

"Items such as employee handbooks, company policy or oral representations, however, *will not* serve to alter the terms for discharge from the general at-will situation of discharge for any reason unless the parties have a *'meeting of the minds'* that said items are to be considered valid contracts altering the terms for discharge." (Emphasis *sic.*) *Turner* v. *SPS Technologies, Inc.* (June 4, 1987), Cuyahoga App. No. 51945, unreported, at 5.

In *Cohen & Co.* v. *Messina* (1985), 24 Ohio App. 3d 22, 24, 24 OBR 44, 46, 492 N.E. 2d 867, 870, the court addressed the mutual assent or "meeting of the minds" requirement of the *Mers* exception and stated:

" 'Such [employee] manuals may be important in establishing the terms and conditions of employment [citation omitted]. *However, in order for such manuals to be considered valid contracts, there must be a 'meeting of the*

*minds'* [citation omitted]. *The parties must have a distinct and common intention which is communicated by each party to the other [party].*" (Emphasis added.)

Thus, absent mutual assent or a "meeting of the minds" by the employer and employee, policy forms or oral representations will not alter the terms for discharge:

"Where such mutual assent is lacking, the handbook or other supplementary materials merely constitute a unilateral statement of company rules and regulations. [Citation omitted.] * * * [A] unilateral statement of company rules and regulations do [*sic*] not constitute an employment agreement and, therefore, no action in contract arises out of a violation of such rules or regulations." *Turner, slip op.,* at 5.

In the case *sub judice,* plaintiff relies on two policy memoranda to argue he could be discharged only for just cause. The first policy memorandum, entitled "Human Resources Manual" on termination provides in relevant part as follows:

"*Employee Initiated Termination*
"* * *

"2.3 *Discharge for cause, such as*: insubordination, absence without leave, divulging confidential Company information, fraudulent application for employment, damage to Company property, dishonesty, theft, commercial bribery or aggressive, abusive, or hostile behavior toward other employees."

Plaintiff then testified he never engaged in or was accused of any of the conduct enumerated under Section 2.3 of the termination manual. However, the termination manual further states as follows:

"*Company Initiated Terminations*
"* * *

"3.3 Inability of the employee to perform his/her responsibilities in a satisfactory manner after counseling and assessment by management."

Plaintiff further relies upon a Hilti policy memorandum on discipline to argue he could be discharged only for just cause. The memorandum provides for a progressive disciplinary procedure which should be followed before discharging a Hilti employee. Plaintiff testified, and defendant admitted, the steps outlined in the policy memorandum were not followed in his case.

Both of Hilti's policy memoranda apply to only "Policy Manual Holders." However, nothing in the record reveals plaintiff received a policy manual from Hilti. Furthermore, if plaintiff did receive the manual, there is no evidence plaintiff signed an attestation clause receiving the manual or agreeing to its terms. Neither of Hilti's policy memoranda establishes a "meeting of the minds" between plaintiff and Hilti. Simply stated, neither policy memoranda contains any language which can be construed as a distinct and common intention to create a contract of employment between the parties. *Cohen, supra,* at 24, 24 OBR at 46, 492 N.E. 2d at 870. Thus, the policy manuals of defendant cannot be relied upon by plaintiff to establish the necessity of following the disciplinary steps prior to discharge or to discharge plaintiff only for just cause. In fact, plaintiff testified he was never told that he could or would be terminated only for just cause.

Plaintiff also argues an implied employment contract was created between the parties from two statements made to plaintiff by Hilti employees. The first statement occurred when plaintiff became a foreman for Hilti. Plaintiff inquired as to what kind of job protection he would have and was told by Hilti's management: "As long as I did a good job, I would have a job." The second statement was made to

plaintiff by William Vannucci. Vannucci frequently told plaintiff: "Take one drink and you're out the door."

Construing these statements most strongly in plaintiff's favor as required by Civ. R. 50(A)(4), we must assume plaintiff established an implied contract of employment between himself and Hilti. Thus plaintiff could be discharged from Hilti only for just cause. See *Mers, supra.*

Plaintiff admitted his employment at Hilti's J & L Steel operation was a dangerous place where one had to "keep his wits." Plaintiff's duties necessitated he work with very heavy equipment including a full-size locomotive, twenty-six-ton molds and two-ton grinders. Plaintiff testified safety was always a concern at the J & L Steel plant.

Considering the hazardous and extremely dangerous work environment at Hilti's J & L Steel operation, it was unreasonable to expect defendant to continue plaintiff's employment if plaintiff's ongoing struggle to control his alcoholism and heroin use made his continued employment with defendant difficult. Plaintiff was not only a danger to himself, but also to others. Plaintiff's lack of self-control over alcohol and drugs rendered him unqualified to work at defendant's J & L Steel operation. The risk of retaining plaintiff was outweighed by the possible disastrous consequences of a "slip" by plaintiff into alcoholism. Plaintiff testified he would be an alcoholic for life and sobriety was a daily struggle. The alcoholic takes "one day at a time" and consciously counts each day from his last drink.

The risk of retaining plaintiff as an employee was also outweighed by Hilti's possible civil liability for plaintiff's conduct. Once Hilti knew of plaintiff's drug and alcoholic propensities, it would have been not only negligent and reckless but also sheer folly for Hilti to return plaintiff to the dangerous environment at J & L Steel's operation. Plaintiff worked not only with Hilti personnel and equipment, but also with the employees and equipment of J & L Steel. An incident involving personal injury or property damage due to plaintiff's conduct while intoxicated could open Hilti to massive liability. Hilti supplies labor for the steel industry and thus each of its customers' work environments would have some element of danger. The risk of incurring huge liability for plaintiff's conduct on the job was prohibitive for the defendant. Hilti had no other choice but to discharge plaintiff after extensive treatment and counseling.

In addition, there is no doubt plaintiff's excessive absences were a burden on Hilti. Plaintiff was a salaried employee whose absence caused the defendant to find other employees to fulfill plaintiff's duties. Given the length of time plaintiff was absent from work due to his continual bouts with alcoholism and drug use, it became a burden for defendant to retain plaintiff as an employee. Hilti could not reasonably be expected to accept plaintiff's absences indefinitely and had no other choice but to discharge plaintiff.

Plaintiff admits he missed a great deal of work at Hilti because of his addictions, but argues he was granted "excused absences." Plaintiff further admitted Hilti was forced to provide an employee to "cover" for plaintiff while he was absent. A review of the facts illustrates plaintiff's continual absences.

From 1982 until his termination from Hilti in 1984 plaintiff made three attempts at rehabilitation at three different treatment facilities. In 1983 plaintiff was a patient at the Alcoholic Clinic of Youngstown. Plaintiff failed to complete the clinic's twenty-eight day program and walked out after only sixteen days. In 1984 plaintiff entered

Serenity Hall at St. John Hospital but left after seven days.

After plaintiff left St. John, he went to Gateway Rehabilitation Center. Once again plaintiff's treatment at Gateway was an excused absence and plaintiff's medical insurance through Hilti covered plaintiff's treatment. On August 22, 1984 plaintiff was released from Gateway, having completed a twenty-eight-day program. In 1984 plaintiff missed forty-five days from his job.

Hilti provided plaintiff three opportunities to be rehabilitated from his addictions. If not for his medical insurance through Hilti, it seems unlikely plaintiff could have sought treatment for his addictions. It is apparent from the record that Hilti assisted plaintiff with his recovery from addictions in every manner possible. In return, Hilti requested plaintiff stop drinking or Hilti would be forced to discharge plaintiff. Vannucci's constant threat to plaintiff that if he drank again he would be "out the door" went unheeded by plaintiff. Plaintiff drank alcohol and injected heroin for five months — March through July 1984 — before seeking treatment or assistance.

The record is replete with uncontroverted evidence of plaintiff's fine work performance record when he worked. Hilti admitted plaintiff was a good employee and gave him one promotion and several merit pay increases. Plaintiff's fine performance record could be the reason Hilti continued plaintiff's employment through two and one-half years of treatment for alcoholism and continual absences. However, this fact does not change plaintiff's alcoholic propensities and poor attendance record. Plaintiff may have been one of defendant's better employees; however, once Hilti knew of plaintiff's alcohol and drug use plaintiff was no longer capable of working at his present position due to the extremely dangerous work environment at J & L Steel. Defendant did a great deal for plaintiff and could not reasonably be expected to retain plaintiff as an employee indefinitely.

Construing the evidence adduced at trial most strongly in plaintiff's favor, reasonable minds could come to but one conclusion and that conclusion is plaintiff was discharged for just cause as a matter of law. Plaintiff was an alcoholic and drug user whose employment environment was hazardous and extremely dangerous. Hilti's continued employment of plaintiff subjected defendant to potential immense civil liability and allowed plaintiff to be a risk to himself and others. Plaintiff's excessive excused absences placed a burden upon defendant to find employees who would fulfill plaintiff's duties. Within the two-year period from 1982 through 1984 plaintiff was absent from work approximately 4.3 months or one hundred twenty-nine days. Defendant provided plaintiff with repeated opportunities to rehabilitate himself and maintained plaintiff's position for him while in treatment. Hilti promised to retain plaintiff as an employee if he did not drink alcohol, yet plaintiff consumed alcohol and injected heroin for five months in violation of defendant's promise. Consequently, the record establishes plaintiff was discharged for just cause.

Plaintiff also argues the trial court erred when it granted defendant Hilti a directed verdict since Ohio law recognizes a breach of the covenant of good faith in terminating an employment relationship. In support of his position plaintiff relies on *Hoskins* v. *Aetna Life Ins. Co.* (1983), 6 Ohio St. 3d 272, 6 OBR 337, 452 N.E. 2d 1315, in which the court held in paragraph one of its syllabus:

"Based upon the relationship be-

28

tween an insurer and its insured, an insurer has the duty to act in good faith in the handling and payment of the claims of its insured. A breach of this duty will give rise to a cause of action in tort against the insurer. (*Hart v. Mutual Ins. Co.,* 152 Ohio St. 185 [39 O.O. 365], followed and extended.)"

Clearly, *Hoskins, supra,* recognized a cause of action for breach of the duty to act in good faith *only* in the context of an insurance contract and has no application in the case *sub judice.*

Assuming, *arguendo,* Ohio recognizes a claim for breach of the covenant of good faith in other than insurance matters, the facts of the case *sub judice* would not support plaintiff's claim. The evidence established Hilti retained plaintiff as an employee after discovering his alcoholism during his mental breakdown as a result of his divorce and provided plaintiff thereafter three opportunities for rehabilitation. Furthermore, defendant told plaintiff that if he took a drink he would be "out the door." Plaintiff drank and used heroin after explicitly being informed by defendant that his continued employment depended upon his sobriety. Thus, defendant acted in good faith when dealing with the plaintiff. As stated above plaintiff was discharged for just cause as a matter of law.

Plaintiff also argues the trial court erred when it granted Hilti a directed verdict on plaintiff's wrongful discharge in violation of public policy claim since this claim is recognized under Ohio law. Specifically plaintiff argues: (1) Alcoholism is a "handicap" as defined by R.C. 4112.01(A)(13), see *Hazlett v. Martin Chevrolet, Inc.* (1986), 25 Ohio St. 3d 279, 25 OBR 331, 496 N.E. 2d 478; (2) Ohio has a public policy in favor of alcohol rehabilitation; (3) plaintiff was discharged for having a handicap, *viz.,* alcoholism; and thus

(4) plaintiff's discharge from his employment at Hilti is in violation of public policy. Plaintiff's argument merits consideration.

In *Phung* v. *Waste Management, Inc.* (1986), 23 Ohio St. 3d 100, 103, 23 OBR 260, 262-263, 491 N.E. 2d 1114, 1117, the court specifically deferred to the General Assembly the responsibility for creating a public policy cause of action or an exception to the employee at-will doctrine. In R.C. 4112.02 the General Assembly created an exception to the employment-at-will doctrine. R.C. 4112.02(A) provides in pertinent part as follows:

"It shall be an unlawful discriminatory practice:

"(A) For any employer, because of the * * * handicap * * * of any person, to discharge without just cause * * * or otherwise to discriminate against that person with respect to * * * tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

R.C. 4112.01(A)(13) defines "handicap" as follows:

"(13) 'Handicap' means a medically diagnosable, abnormal condition which is expected to continue for a considerable length of time, whether correctable or uncorrectable by good medical practice, which can reasonably be expected to limit the person's functional ability, including, but not limited to, seeing, hearing, thinking, ambulating, climbing, descending, lifting, grasping, sitting, rising, any related function, or any limitation due to weakness and significantly decreased endurance, so that he can not perform his everyday routine living and working without significantly increased hardship and vulnerability to what are considered the everyday obstacles and hazards encountered by the nonhandicapped."

In *Hazlett* v. *Martin Chevrolet, Inc.*

(1986), 25 Ohio St. 3d 279, 25 OBR 331, 496 N.E. 2d 478, syllabus, the court held: "Drug addiction and alcoholism are handicaps as defined in R.C. 4112.01(A)(13)." In *Hazlett* the plaintiff informed his employer that plaintiff needed a twenty-eight-day leave to obtain treatment for his drug addiction. In response to plaintiff's request, defendant summarily discharged plaintiff.

The facts of the case *sub judice* differ greatly from *Hazlett, supra.* Hazlett was a "white collar" employee whose responsibilities included the sale and implementation of dealer financing for his employer's new car customers. Plaintiff in the case *sub judice* was a foreman in a steel plant. Plaintiff's work environment was extremely dangerous and required one to keep his wits about him. Furthermore, Hazlett was discharged as soon as his employer discovered his drug addiction. Hilti, on the other hand, provided plaintiff three opportunities to rehabilitate himself and maintained his employment for approximately two years after discovering plaintiff's alcoholism and drug addiction. An interesting issue presents itself: How many times must an employer grant an employee the opportunity for rehabilitation and hold his job open?

R.C. 4112.02(A) mandates handicapped persons cannot be discharged from their employment without just cause. *Hazlett, supra,* held that alcoholism was included in the definition of a "handicap" set forth in R.C. 4112.01(A)(13). Therefore, an alcoholic employee cannot be discharged without just cause pursuant to R.C. 4112.02(A). Although it is by no means clear, it can be argued at the time plaintiff was discharged he no longer was a handicapped person since he completed the program at Gateway and was considered rehabilitated. However, in the case *sub judice* plaintiff was discharged for just cause from Hilti as a matter of law as fully discussed above. Thus, no violation of R.C. 4112.01(A) existed and plaintiff was properly discharged.

Plaintiff further argues the trial court erred when it granted defendant Hilti a directed verdict on plaintiff's reckless infliction of severe emotional distress claim. However, the trial court did not err since plaintiff was unable to establish a prima facie case of reckless infliction of emotional distress.

In *Yeager* v. *Local Union 20* (1983), 6 Ohio St. 3d 369, 6 OBR 421, 453 N.E. 2d 666, syllabus, the court held:

"One who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." (Citation omitted.)

In *Pyle* v. *Pyle* (1983), 11 Ohio App. 3d 31, 11 OBR 63, 463 N.E. 2d 98, paragraph two of the syllabus, this court set forth the elements necessary to establish a *prima facie* case of intentional infliction of serious emotional distress when it held as follows:

"a) * * * the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff;

"b) * * * the actor's conduct was extreme and outrageous, that it went beyond all possible bounds of decency and that it can be considered as utterly intolerable in a civilized community;

"c) * * * the actor's actions were the proximate cause of the plaintiff's psychic injury; and

"d) * * * the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it."

In the case *sub judice* Hilti's conduct was not extreme and outrageous.

The evidence established defendant Hilti sought what was in plaintiff's best interest and was careful not to disturb plaintiff's emotions prior to his discharge. For example, Hilti paid for, through medical insurance, plaintiff's treatment at three different rehabilitation facilities. Hilti could have terminated plaintiff's employment after plaintiff's first attempt at treatment failed. Instead, Hilti discharged plaintiff *after* he completed the rehabilitation program making it possible for plaintiff to receive assistance at Gateway. Moreover, plaintiff testified he felt he had the support of Hilti while in Gateway.

In addition, Hilti gave plaintiff a week off after his discharge from Gateway to "get adjusted" before informing him that he was terminated. Plaintiff was absent from work approximately forty-five days when he was released from his employment. Defendant gave plaintiff a week off in consideration of plaintiff's emotional state after his release from Gateway. If Hilti had immediately discharged plaintiff upon his release from Gateway it may have upset plaintiff emotionally and affected his rehabilitation, so Hilti waited a week to let plaintiff "get adjusted."

Since Hilti's conduct was not extreme and outrageous, plaintiff was unable to establish one of the prima facie elements necessary for a claim of reckless infliction of emotional distress.

The trial court in the case *sub judice* did not err when it granted defendant's motion for directed verdict on plaintiff's claims since plaintiff was discharged for just cause as a matter of law, defendant's conduct was not extreme and outrageous to establish a reckless infliction of emotional distress claim and Ohio law does not recognize a claim for breach of the covenant of good faith in terminating an employment contract for just cause.

Accordingly, plaintiff's assignments of error are not well-taken and are overruled.

*Judgment affirmed.*

DYKE and WIEST, JJ., concur.

MARK K. WIEST, J., of the Court of Common Pleas of Wayne County, sitting by assignment.