OPINION
This is an appeal taken from a final judgment of the Lake County Court of Common Pleas. Appellant, Brent E. Burdine, appeals from the trial court's judgment granting appellees', Avery Denison Corporation ("Avery") and James Gessic ("Gessic"), motion for summary judgment. For the reasons that follow, the judgment of the trial court is affirmed.
Appellant, an African-American male, was hired by Avery to work in the Finishing Department at the company's Specialty Tape Division ("STD") on February 21, 1994. He was subsequently terminated on June 27, 1996 for excessive absenteeism.
As was customary with Avery, appellant was initially hired on a probationary basis. After successful completion of the probationary period, appellant became a full-time, at-will employee of the company on June 2, 1994.
In April 1995, appellant was transferred to Avery's Coating Department where he was assigned to a machine with a line operator and two or three other employees. Appellant and the other employees were responsible for making sure that the machine was supplied and in proper working order. The line operator, Gessic, supervised the entire operation of the machine.[1]
With respect to discipline, Avery utilized a multi-step procedure designed to provide employees with the opportunity to rectify any unacceptable performance or behavior. Generally, employees were subject to progressive discipline ranging from verbal and written warnings, up to and including termination.
Avery incorporated this multi-tiered procedure into STD's general attendance policy. Under STD's policy, once an employee exceeded forty hours of employee controllable absence, the employee advanced one step on a progressive scale for each subsequent "event." An "event" was defined in Avery's policy as "[a]ny employee controlled absence of 15 minutes or more, after forty (40) hours of employee controllable absence has occurred."
Notwithstanding special circumstances, on the first event of absenteeism after an employee reached the initial forty hours, the employee's immediate supervisor counseled the employee. On the second event, the employee was once more verbally counseled by his/her supervisor. For step three, the employee received a formal written warning. At the fourth step, the employee was issued a final written warning. On the fifth step, the employee was suspended. For any further violations of the attendance policy, the employee would be discharged from employment. However, if an employee who has started up the disciplinary scale achieved "perfect attendance" for a specified period, that person would have his/her discipline record reduced by one step.
By his fifth month of employment, appellant had already accumulated over forty hours of "employee controllable absences." Thus, his absence on November 18, 1994 became an "event" and appellant reached step one of the attendance policy. Appellant again had "employee controllable absences" from work on the following days: January 7, 1995, February 18, 1995, and March 13, 1995. However, Avery did not count those absences against appellant. On April 28, 1995 and April 29, 1995, appellant accrued two more such "events." Accordingly, he reached step three, and was given a written warning signed by his immediate supervisor, Bill Tripp.
On June 1, 1995, one day short of his one-year anniversary at Avery, appellant was an hour late for work. This "event" resulted in appellant attaining step four of the attendance policy. As a result, appellant was issued a final written warning that any further absences would result in his suspension. Appellant was also informed that if he maintained "perfect attendance" for a 360-day period he could move back one step. Nevertheless, on December 9, 1995, appellant missed work due to illness. Avery however, did not count this absence against appellant for disciplinary purposes.
Appellant reached step five of the attendance policy when he was absent from work January 25, 1996. This "event" resulted in a three-day suspension. At this time, appellant was warned that another absence would result in his termination, and that he could move back one step if he maintained "perfect attendance" for a 120-day period.[2]
In February 1996, appellant was absent a total of nine days for medical treatment. Appellant was also absent on June 9, 1996 as a result of an injury to his son. None of the above absences were charged to appellant for disciplinary purposes, and he remained at step five of the attendance policy.
On June 27, 1996, appellant missed work because he could not find transportation. This "event" caused appellant to move up to step six of Avery's attendance policy, which resulted in appellant's immediate discharge.
Appellant filed a complaint in the Lake County Court of Common Pleas against Avery and Gessic on July 2, 1997. In the complaint, appellant alleged that Avery and Gessic discriminated against him on the basis of his race in violation of R.C. Chapter 4112. Also included in the complaint were additional claims for breach of express and implied promises relating to employment, promissory estoppel, and intentional infliction of emotional distress. Appellant also sought to have an arbitration agreement between himself and Avery declared invalid.[3] In response, Avery and Gessic filed a joint answer denying the substance of appellant's allegations and setting forth various affirmative defenses to the claims contained in the complaint.
Following the initial pleadings, the parties engaged in discovery. The record shows, however, that appellant failed to promptly respond to several of appellees' initial discovery requests, including requests for admissions, requests for documents, and interrogatories. In addition, appellant also declined to appear at four properly noticed depositions. On March 30, 1998, appellant eventually filed a motion with the trial court seeking a six-week extension to respond to appellees' discovery requests.
On April 27, 1998, the trial court conducted a pretrial hearing to ascertain the status of the case. At that time, appellees still had not received any discovery responses from appellant, and as a result, filed a motion for summary judgment based upon appellant's failure to respond to appellees' request for admissions. The trial court did not rule on appellees' motion at that time, but instead, instructed the parties that discovery was closed as of that date, except by agreement of the parties. The trial court further ordered that any outstanding discovery should be promptly completed, and dispositive motions must be filed by May 14, 1998.
On May 14, 1998, appellees filed their motion for summary judgment on the merits, despite the fact that appellant had not appeared for four depositions or responded to appellees' interrogatories.[4] Appellees also filed a motion to dismiss for want of prosecution and/or abuse of discovery process.
On the same day, appellant filed a motion for summary judgment regarding the parties' arbitration agreement. Appellant also served appellees with a notice of deposition asking to depose appellees on May 18, 1998. Because the time for discovery had already ended, appellees promptly filed a motion for a protective order with the trial court to prevent the depositions from taking place.
Appellant finally appeared for a deposition on May 20, 1998. On June 3, 1998, appellant filed a motion for an extension of time in which to file responsive pleadings. Appellees objected. Over the next month and a half, appellant filed several more extension requests until he finally responded to appellees' motion for summary judgment on the merits on July 28, 1998. Three days later, appellant filed two additional motions, one in opposition to appellees' motion for a protective order, and another addressing appellees' motion for summary judgment based upon admissions.
On September 4, 1998, the trial court issued a decision with respect to all of the parties' outstanding motions. In doing so, the trial court granted appellees' motion for summary judgment with respect to appellant's claims for breach of contract/promissory estoppel and intentional infliction of emotional distress. However, the trial court denied appellees' motion on appellant's discrimination claims, finding that certain factual disputes existed which precluded summary judgment.[5]
The trial court also denied appellant's motion for summary judgment on the arbitration agreement, concluding that Civ.R. 56 did not apply to an affirmative defense.
As for appellees' motion for a protective order, the trial court found that appellant had ample opportunity before April 27, 1998 to schedule depositions and that appellees had not agreed to any further discovery. As a result, the trial court granted appellees a protective order.
On September 19, 1998, appellees filed a motion for reconsideration with the trial court regarding the court's September 4, 1998 judgment entry. In support, appellees argued that appellant failed to carry its burden of proof on his prima facie case of discrimination because he failed to present evidence that he was qualified for his position at Avery due to his excessive absenteeism. According to appellees, whether appellant's absences were classified as excused or unexcused under Avery's attendance policy was immaterial to appellant's failure to maintain 120 days of "perfect attendance."
After reconsidering the arguments of the parties, the trial court agreed with appellees and concluded that appellant failed to prove a prima facie case of discrimination because appellant could not show he was qualified for the position. The trial court's decision was ultimately based upon appellant's failure to maintain 120 days of "perfect attendance." As a result, the court was precluded from addressing the factual disputes which would only have relevance if a prima facie case were first established.
From these two decisions, appellant filed a timely notice of appeal with this court. He now asserts the following assignments of error for our consideration:
 "[1.] The trial court erred in granting appellees' motion for summary judgment on appellant's claim for racial discrimination in employment and in termination.
 "[2.] The trial court erred in granting appellee employer's motion for summary judgment on appellant's claim for breach of express and implied promises and for promissory estoppel.
 "[3.] The trial court erred in granting summary judgment in favor of Appellee James Gessic.
 "[4.] The trial court erred in granting Appellees' motion for summary judgment on appellant's claim of intentional infliction of mental and emotional distress.
 "[5.] The trial court erred in granting appellees' motion for a protective order concerning discovery."
 Appellant's first and third assignments of error both involve appellant's claim for unlawful racial discrimination. Hence, they will be dealt with in a consolidated fashion. Appellant proposes two theories in support of his claim of racial discrimination. First, appellant maintains that he presented direct evidence of racial discrimination which should have precluded summary judgment. In particular, appellant alleges that he was subject to persistent racial harassment by his line operator, Gessic, and that Avery failed to exercise reasonable care in remedying the abusive situation in spite of appellant's repeated complaints. Appellant further argues that Avery's failure to prevent and/or correct the problem with Gessic, in addition to the lack of a written policy against racial harassment, resulted in a racially hostile environment which, in turn, contributed to his attendance problems.
Under his second theory, appellant submits that he presented inferential evidence of racial discrimination in support of his claim. Appellant argues that there was evidence to show that he was treated differently than similarly situated white employees with respect to Avery's attendance policy, and that Avery was using the attendance policy as pretext for denying appellant his seniority rights. This evidence, appellant believes, was sufficient to demonstrate a prima facie case of discrimination, placing the burden on Avery to present evidence demonstrating a legitimate, nondiscriminatory reason for appellant's termination.
Summary judgment is proper when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come but to one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence construed most strongly in his favor. Civ.R. 56(C); Leibreich v. A.J. Refrigeration, Inc.
(1993), 67 Ohio St.3d 266, 268.
Material facts are those facts which might affect the outcome of the suit under the governing law of the case. Turner v. Turner
(1993), 67 Ohio St.3d 337, 340, citing Anderson v. Liberty Lobby,Inc. (1986), 477 U.S. 242, 248. To determine what constitutes a genuine issue, the court must decide whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. Turner at 340.
The party seeking summary judgment on the grounds that the nonmoving party cannot prove its case bears the initial burden of informing the trial court of the basis for the motion and of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claims. Dresher v. Burt (1996),75 Ohio St.3d 280. The moving party must be able to point specifically to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claim. Id.
If this initial burden is met, the nonmoving party has a reciprocal burden to respond, by affidavit or otherwise as provided in the rule, in an effort to demonstrate that there is a genuine issue of fact suitable for trial. Id. If the nonmoving party fails to do so, then the trial court may enter summary judgment against that party. Id.
Appellant's claim of racial discrimination was brought under R.C. 4112.02, which provides in pertinent part:
"It shall be an unlawful discriminatory practice:
 "(A) For any employer because of race * * * to discharge without cause * * * or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any other matter directly or indirectly related to employment."
 It is well settled in Ohio that when addressing claims brought pursuant to R.C. Chapter 4112, federal case law interpreting Title VII of the Civil Rights Act of 1964 is generally applicable. Plumbers and Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm. (1981), 66 Ohio St.2d 192, 196, citing Republic Steel v. Ohio Civ. Rights Comm. (1975), 44 Ohio St.2d 178 and Weiner v. Cuyahoga Community College Dist. (1969), 19 Ohio St.2d 35. See, also, Ohio Civ. Rights Comm. v. Kent State University (1998), 129 Ohio App.3d 231, 244.
Under Title VII, an employee may prove racial discrimination in a disparate treatment case, such as the instant matter, in one of two ways; either directly or indirectly. For example, if an employee can establish intentional discrimination by a preponderance of direct evidence, the burden of proof shifts to the employer to show that it would have made the same employment decision even without the discriminatory animus. Kent State at 245; Price Waterhouse v. Hopkins (1989), 490 U.S. 228, 244-245.
In other words, an employee may establish a prima facie case of discrimination directly by presenting evidence, of any nature, to show that the employer was more likely than not motivated by discrimination. Mauzy v. Kelly Services, Inc. (1996), 75 Ohio St.3d 578,586-587. See, also, Byrnes v. LCI CommunicationHoldings Co. (1996), 77 Ohio St.3d 125, 128-129. As noted by the Supreme Court of Ohio in Mauzy at 586, "the term `direct evidence,' whatever it means and to the extent it is even required, is used to distinguish a * * * Price Waterhouse case from a McDonnell Douglas [Corp. v. Green (1973), 411 U.S. 792] case[,]" which will be discussed below.
When there is no direct evidence to support a discrimination claim, an employee may still prevail if he or she can establish a case of intentional discrimination through indirect evidence. As we stated previously, the framework under which a court evaluates a claim such as the one presented here was largely established by the United States Supreme Court in McDonnell Douglas. In Plumbers Steamfitters, supra, the Supreme Court of Ohio adopted theMcDonnell Douglas standards for a case brought under R.C.4112.02. Kohmescher v. Kroger Co. (1991), 61 Ohio St.3d 501, 504.
Utilizing McDonnell Douglas, an employee must first establish a prima facie case of discrimination, which requires proof of the following elements under the facts of this case: (1) that the employee was member of a protected class of persons; (2) that he was discharged from employment; (3) that he was qualified for the position; and (4) that he was replaced by, or that his discharge permitted the retention of, a person not belonging to the employee's protected class. Barker v. Scovill, Inc. (1983),6 Ohio St.3d 146, paragraph one of the syllabus.[6]
Once a prima facie case has been established, a presumption of unlawful discrimination arises. Thus, in order to avoid an adverse result, the employer must present a legitimate, nondiscriminatory reason for the employee's discharge. Barker at 148. If the employer does advance permissible grounds for the termination, the employee then has the burden of proving that the reasons proffered by the employer were merely a pretext for intentional discrimination. Id. If the employee fails to establish a prima facie case of employment discrimination, or is unable to refute the employer's asserted lawful basis for the discharge, the employee's case will be dismissed. Id.
To be clear, the difference between a "direct" evidence PriceWaterhouse case, and an "indirect" evidence McDonnell Douglas
case, is the method of proof and not the type of evidence to be introduced in support of the discrimination claim. Mauzy at paragraph one of the syllabus.
In the case at bar, the parties failed to argue to the trial court the existence of direct evidence, i.e., Price Waterhouse. Moreover, the trial court's decision was clearly made using theMcDonnell Douglas scheme. As a result, we will confine our analysis to the indirect evidence theory and will refrain from discussing the evidence in the context of a Price Waterhouse
situation. Kent State at 245.
Here, the trial court concluded that appellant failed to meet his initial burden of proving a prima facie case of discrimination. No one disputes that appellant is part of a protected class and that he was discharged from employment. Furthermore, in the first summary judgment exercise, the trial court found that a factual dispute existed regarding whether appellant was qualified for the position. Upon reconsideration, however, the trial court subsequently found that appellant failed to set forth any evidence establishing his qualification for the position. In particular, the trial court concluded that appellant failed to show he had achieved the requisite "perfect attendance" to move from step five back to step four. As a result, when he was absent on June 27, 1998, appellant reached the sixth and final step under STD's attendance policy, requiring discharge. Based on appellant's failure to prove he was qualified for the position due to his excessive absenteeism, the trial court determined it was unnecessary to consider the other two factors required to prove a prima facie case of discrimination.
In the instant matter, the precise issue presented turns on whether appellant reached step six under STD's attendance policy, thereby justifying his discharge. Appellant submits that from the time he reached step five on January 25, 1996, until his final absence on June 27, 1996, he maintained a record of "perfect attendance." Despite conceding the fact that he missed several days during the relevant period, appellant argues that those absences should not be counted against his attaining the 120 days of "perfect attendance" because they were considered "excused" absences by Avery.
Avery counters appellant's position by arguing that the term "perfect attendance" as used in the STD attendance policy is self-explanatory. That is, to be entitled to a step back, an employee can not miss any days of work during the probationary period, regardless of whether the absence was "excused."
In the STD policy, maintaining "perfect attendance" is offered as a remedy to an employee with an existing disciplinary problem. If an employee accrued a disciplinary step or steps, the employee could back up the process by maintaining "perfect attendance." Subsection IV(E)(3) reads: "For each 120 dayperiod of perfect attendance, discipline will be reduced by one step if the employee has a disciplinary step or steps forattendance." (Emphasis in original.)
The following additional terms are also defined in the STD's attendance policy: "an event of absenteeism," "controllable and excused absence," and "employee controllable absence." The policy also specifically states that a "controllable and excused absence" "will not be included in the calculation of absentee time or for disciplinary purposes." (Emphasis added.) Appellant makes the argument that the step back procedure utilized by Avery falls under the ambit of "disciplinary purposes." Therefore, he posits that an excused absence would not affect his attempt at "perfect attendance" because it should not be counted for "disciplinary purposes."
However, the only "excused" absence defined by the STD policy is that of a "controlled and excused absence." Presumably, it is this definition to which appellant refers when he speaks of an "excused" absence. Unfortunately for appellant, he has confused "controllable and excused absences" with "events" of "employee controllable absences."
The record indicates that the absences accumulated by appellant after he reached step five on January 25, 1996 were not excused absences because they were not "controllable and excused absences" as defined by the policy. Rather, they were "events." As previously indicated, an "event," was defined as "[a]ny employee controllable absence of 15 minutes or more, after forty (40) hours of employee controllable absence has occurred." (Emphasis added.)
Furthermore, the STD policy specifically states that "employee controllable absences" can be used in the calculation of absentee time off for purposes of disciplinary action. Thus, the absences which immediately proceeded his dismissal were all "employee controllable absences;" i.e., "events," which could trigger the disciplinary process. Appellant's argument that the absences at issue should not count because they were "excused" absences is contrary to the specific terms of the attendance policy. Specifically, "controllable and excused absences," as defined by the policy at subsection IV(B), were not the type incurred by appellant because the relevant absences occurred after
the 40 hour threshold. Appellant's absences which triggered the fifth and sixth steps were "events" of "employee controlled" absenteeism as defined by the policy. Because they occurred after
the initial forty hours, the absences became "events" and were not considered to be excused, i.e., "controllable and excused absences."
As defined in the policy, sickness and accident are "excused and controllable absences" only when they occur prior to the accumulation of forty hours of "employee controllable absence."After the forty hours has accrued, however, a personal or family illness is not considered to be an excused absence, but instead is an "event" of "employee controlled absence." In the instant matter, there is no dispute that the initial forty hours had occurred.
In light of the above definitions, the term "perfect attendance" can have only one meaning: a period of time during which there is no "event" of "employee controllable absence" of 15 minutes or more, after forty hours of "employee controlled absence" has occurred.
Regular attendance is an essential function of any position.Pfleger v. BP America, Inc. (June 27, 1996), Cuyahoga App. No. 68874, unreported, at 6, 1996 WL 355290. Obviously, if an employee is unable to comply with attendance requirements, he or she is unqualified for the job. Green v. Illinois Power Co. (Apr. 21, 1999), Seventh Circuit No. 98-3276, unreported at 8, 1999 U.S. App. LEXIS 8251; Jones v. Sprint Internatl. (Oct. 2, 1996), Fourth Circuit No. 96-1180, unreported, 1-2, 1996 U.S. App. LEXIS 26048; and Figgous v. Allied/Bendix Corp., Allied-Signal (1990),906 F.2d 360, 362. Because appellant failed to present evidence that he was qualified for the position, his first and third assignments of error are without merit.
As for appellant's second assignment of error, he argues that the trial court erred in granting summary judgment on his claims for breach of contract and promissory estoppel. He claims there was, at a minimum, an implied agreement between the parties concerning attendance and the conditions under which appellant could be discharged for violations of the attendance policy. For the following reasons, we disagree.
As discussed in our resolution of assignments of error one and three, we conclude that Avery did not violate its own attendance policy. Thus, the second assignment of error is moot. In the alternative, the record is replete with evidence in which Avery extended every benefit of the doubt to appellant. Nevertheless, he continued to flaunt the very rules he now accuses Avery of violating.
Even if we had found that Avery violated its own attendance policy, appellant's argument would still lack merit. It is well established in Ohio that in an at-will employment relationship, an employer may terminate an employee for any reason which is not contrary to law, unless otherwise agreed to by the parties. Mersv. Dispatch Printing Co. (1985), 19 Ohio St.3d 100, paragraph one of the syllabus. However, certain facts may exist which give rise to express or implied contractual provisions that alter the terms of an at-will employment relationship, such as an employee handbook, company policies, or oral representations. Mers at 104. Regardless, items such as those mentioned above, "will not serve to alter the terms of discharge for any reason unless the parties have a `meeting of the minds' that said items are to be considered valid contracts altering the terms of discharge." Brandenburgerv. Hilti (1989), 52 Ohio App.3d 21, 24, quoting Turner v. SPSTechnologies, Inc. (June 4, 1989), Cuyahoga App. No. 51945, unreported, at 5. See, also, Patrick v. Painesville CommercialProperties, Inc. (1994), 99 Ohio App.3d 360, 363.
Despite appellant's acknowledgment that he was an at-will employee subject to discharge for any reason not contrary to law, he still argues that the parties intended to enter into an implied contract to restrict Avery's right to terminate appellant's employment. However, the record provides no support for his conclusion. Appellant signed Avery's disclaimer noting that he was an at-will employee. Furthermore, the attendance policy itself declares that it is only a "guideline," and that it empowers the supervisor with a degree of discretion. As a result, there was no evidence of an implied contract.
With respect to appellant's claim involving promissory estoppel, we reach a similar conclusion. An employee must prove the following elements to be successful on a claim for promissory estoppel: (1) there was a clear and unambiguous promise; (2) there was reliance by the party to whom the promise was made; (3) the reliance was reasonable and foreseeable; and (4) the party claiming estoppel was injured by the reliance. Patrick v.Painseville Commercial Properties, Inc. (1997), 123 Ohio App.3d 575,583.
Again, for the sake of argument, even if Avery had failed to comply with the policy, there is no evidence in the record that appellant relied upon the policy in any way. Despite knowing of the policy and its terms, appellant continued to dance with the devil by regularly missing work beyond the forty-hour threshold. Accordingly, we conclude that appellant's second assignment of error is moot because of the first and third assignments, or in the alternative, it is meritless.
In assignment of error four, appellant claims that the trial court erred in granting appellees summary judgment on his claim for intentional infliction of emotional distress. In support, appellant argues that the continued harassment by Gessic resulted in appellant's drinking problem which, in turn, led to appellant's hospitalization for his problem and his eventual discharge from Avery.
In order to establish a claim for intentional infliction of emotional distress, a plaintiff must prove the following: (1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to cause or knew or should have known that his conduct would cause plaintiff serious emotional distress; (3) the defendant's conduct was the proximate cause of plaintiff's emotional injury; and (4) the plaintiff's injury was both severe and debilitating. Yeager v. Local Union 20 (1983), 6 Ohio St.3d 369, syllabus. See, also, Cooper v. Metal Sales Mfg. Corp.
(1995), 104 Ohio App.3d 34, 42.
In the instant matter, the trial court concluded that appellant failed to demonstrate that he suffered emotional distress as a result of Avery's and Gessic's actions. After a complete and thorough review of the record, we agree. Giving the benefit of any reasonable inference to appellant's claims with respect to the actions of both Gessic and/or Avery, appellant failed to demonstrate proximate cause. Appellant claimed he voluntarily admitted himself into an alcohol abuse program in an effort to control his drinking problem. He also blamed his drinking problem on the alleged harassment he received while working at Avery. In turn, he claimed his hospitalization lead to, and caused, his discharge from the company. However, without more to substantiate his allegations, appellant was merely speculating, or at best stacking inference upon inference. Appellant failed to link, in any evidential manner, his drinking problem to his employment, to his hospitalization, to his discharge. Without proximate cause, there is no actionable injury.
Even if appellant could establish proximate cause, he still failed to provide any evidence that he suffered an emotional injury as a result of his discharge from Avery. Because he failed to provide such critical evidence of both proximate cause and emotional injury, appellant's claims must be denied as a matter of law. Thus, summary judgment was appropriate. Appellant's fourth assignment of error is, therefore, without merit.
In his final assignment of error, appellant contends that the trial court erred in granting appellees' motion for a protective order regarding further discovery. According to appellant, appellees' general allegations of abuse of the discovery process were unfounded, and even if there were some merit to the claims, it did not justify a protective order. We disagree.
Civ.R. 26(C), which gives the trial court the power to grant protective orders regarding discovery, states in pertinent part:
 "Protective Orders. Upon motion by any party or by the person from whom the discovery is sought, and for good cause shown, the court in which the action is pending may make any order that justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that the discovery not be had; * * *."
 Trial courts have broad discretion in deciding whether or not to grant a protective order. As a result, the trial court's decision will not be disturbed on appeal in the absence of an abuse of discretion. Biddle v. Warren Gen. Hosp.
(March 27, 1998), Trumbull App. No. 96-T-5582, unreported, at 35, 1998 Ohio App. LEXIS 1273. An abuse of discretion connotes more that an error of judgment; instead, it implies an attitude on the part of the court that is unreasonable, unconscionable, or arbitrary. Franklin Cty. Sheriff's Dept. v. State Emp. Relations Bd.
(1992), 63 Ohio St.3d 498, 506.
Appellant's specific complaint is that when he attempted to depose appellees on a date that fell after the trial court's date for discovery cut-off, the trial court issued a protective order. The trial court concluded that appellant had been provided with ample opportunity to schedule depositions before the deadline for discovery. The courts decision was based on the following facts: appellant only gave two days notice for the requested deposition; notice was given after the discovery cut-off date; and appellant failed to appear for four properly noticed depositions. Additionally, the court cited the "significant problems relating to the discovery process * * *."
After reviewing the entire record, we conclude that the trial court did not abuse its discretion in granting appellees a protective order. Appellant had from July 2, 1997, the day the complaint was filed, to April 27, 1998, the day of the pre-trial, in which to attempt to depose appellees. However, appellant failed to take advantage of this opportunity, even when the court set a deadline date in May. Instead, he first asked to depose appellees after the date the trial court had set for dispositive motions. No compelling excuse was offered for appellant's previous failure to initiate its deposition request and notice. Appellant's fifth assignment of error is without merit.
Based on the foregoing reasons, appellant's assignments of error lack merit. Accordingly, the judgment of the trial court is affirmed.
 ______________________________________ JUDITH A. CHRISTLEY, PRESIDING JUDGE
NADER, J., concurs, O'NEILL, J., dissents.
[1] While Gessic supervised the operation of the machine, he was not appellant's immediate supervisor for disciplinary purposes. Gessic was not responsible for making any decisions in regard to appellant's employment status.
[2] No specific explanation is given as to why appellant was required to maintain 360 days of "perfect attendance" when he reached Step Four. Appellant, however, does not challenge this point on appeal.
[3] During the early stages of the litigation, Avery decided to forego any dispute involving the enforceability of the parties' arbitration agreement and did not oppose the jurisdiction of the trial court. As a result, the enforceability of the agreement became essentially moot and is not at issue on appeal.
[4] On May 12, 1998, appellees received appellant's response to their requests for admissions.
[5] Those factual issues involved the following: (1) whether certain absences by appellant were excused or unexcused for purposes of calculating "perfect attendance;" (2) whether a white employee who had achieved "perfect attendance" and was subsequently dropped down a step was similarly situated to appellant; and (3) with regard to the racially hostile work environment, the nature and extent of the alleged racial slurs.
[6] The elements of a prima facie case of intentional discrimination will necessarily vary depending on the specific factual situation. McDonnell Douglas at 802, fn. 13.